# MAY 11, 1938

FOBIE GRAYS and SAM CASH V. THE STATE.

No. 19686. Delivered May 11, 1938.

The opinion states the case.

*C. C. Ingram, Jr.,* of Wharton, and *O. H. Middlebrooks,* of El Campo, for appellants.

*Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

GRAVES, JUDGE.—The appellants Fobie Grays and Sam Cash were charged with murder, and each given the death penalty.

There are no bills of exception in the record. However, on account of the severity of the punishment we have carefully gone over the facts herein. Briefly, they are as follows:

Appellants were charged by an indictment in the first count with killing Paul Henig by choking him with their hands; in the second count with killing Paul Henig by strangulation, and in the third count with killing him in some manner, and by some means and instruments and weapons to the grand jurors unknown.

The facts show that the deceased, Mr. Henig, was at a neighbor's house at about 7 o'clock in the evening of the night he was killed, and exhibited between fifty and sixty dollars in money which he carried in a pouched sack on his person. He seemed to be a small man, and probably rather sickly looking, of Jewish extraction, and owned and ran a small store in the town of Glenflora, and slept in the rear of the building on a cot. A little later in the same night deceased was seen at the home of another friend. About 9:30 that night another friend had parked his car just in front of Henig's store, and perceiving Mr. Henig approached, he moved his car in order that Mr. Henig could park his, Henig's car, in front of the store as was his custom to thus do. This is the last time deceased was seen alive by anyone, save the appellants. In a few minutes witnesses for the State heard some kind of noise proceeding from the direction of deceased's store, but could not describe it, and thought nothing of it. Sometime after breakfast, on the next day, friends of the deceased, not having seen him, and his store being closed, made an investigation, and found where a window of the store building had been prized open and an entry had been made therein, and located the deceased's body inside his store, where evidences of a struggle were seen, and from the surroundings it was deducible that deceased had met his death early in the previous night at the hands of an assailant whose motive was robbery.

There was very little blood in evidence, some about deceased's mouth where a tooth had been knocked out, evidently in the struggle; the deceased was dressed, except for his coat and vest, and his suspenders were down, his cot was broken down, and one of deceased's teeth was lying on a shelf, evidently the tooth which was knocked out when his mouth was cut, as shown by a bruise on his lip; there was also found a blanket, rolled up on the bed "like you would roll up a quilt and wring it out," and on this blanket was found some blood. There was no money in

his pockets except two nickels, although his pouch purse was in his pocket, but it was empty. The appellant Fobie Grays washed dishes and cooked at the drug store next door to deceased's place of business. The appellant Fobie Grays manifested a great interest in the proceedings after the discovery of the dead body. He was among one of the first in the store; he followed the officers around, and seemed to be trying to find out what they were talking about. This conduct caused his arrest, and he made the following confession, after having been given the legal warning:

"My name is Fobie Grays; I am 22 years of age. I reside at Glen Flora, Texas. I have been working for Mr. Raymond Roecker at Glen Flora. On the night of Sunday, December 19, 1937, I got off from work at about 8 P. M. I went from Mr. Roecker's to Jud Sander's place, which is a colored restaurant across the track in Glen Flora from Mr. Roecker's place. I stayed at Jud's Place a few minutes and then went down to Louie Ray's place (confectionery). When I got to Louie's Place, Sam Cash was there. I was looking for Sam then because of some plans we had made that day.

"About two o'clock that same Sunday Sam Cash and I were standing in front of Mr. Jaeger's place and Sam asked me where we could get some money. I said I didn't know and Sam said: 'Do you reckon we could get some money from that Jew (meaning Paul Henig); maybe we could hide in his store until he comes in to go to sleep.' I said maybe we could do that and Sam told me to meet him across the track in the nigger quarter after I got off and we would see about hiding in the store.

"That is the reason I was looking for Sam that Sunday night after I got off from work. When I found Sam in Louie's Place he said: 'are you ready' and I said I was and we left together. When we were crossing the track about the depot we saw a car coming and it was Mr. Henig by himself. He drove up in front of his store and stopped his car and then he walked around to Mr. August Heyne's Place. While he was going to Mr. Heyne's place we went to the back of his store. Sam Cash took a piece of iron and placed it in the crack of the wooden window and pried it open. It came open easy. We then crawled in through that side of the glass window where the glass was broken out. Sam went in first. We went through the back where Mr. Henig lived to the front where some clothes were hanging and hid in the clothes.

"In about five minutes Mr. Henig came in through the front door. He went behind the partition and started undressing. Sam told me to stay where I was and he tiptoed around the partition and then I heard Mr. Henig say: 'whoa, who is that?' Then I

heard some tussling and heard something hit the wall on the side next to Mr. Roecker's. Then I heard Mr. Henig groan and I went around the partition. I met Sam and he said: 'I got the money, let's go.' We went out the window the same way we came in. When I saw Mr. Henig he was laying still on the floor in front of the cot. I don't know whether Sam choked him or what.

"About Robert Ray's house Sam gave me $3.00 and told me that he got $6.00 loose out of his side pocket. Sam went home and I went to Henry Johnson's Place. Sam told me not to say anything about it. We didn't count the money until we got out the store. Sam may have gotten more money and held out on me.

"Witness my hand at Wharton, Texas, this December 24, 1937.
"Witness:                                    "(Signed)    Fobe Grays.
          "C. R. Siebrecht
          "Ed. R. Schattel."

The appellant Sam Cash also made a statement after a proper warning, as follows:

"On Sunday afternoon about 2 or 3 o'clock I was standing in front of Mr. Jeager's store talking to Phobie Grays; I call him Red. I asked Red where he could get some money and he told me we could rob the Jew, meaning Paul Henig. I didn't want to do that and told Red I was going to borrow some money for Christmas, but he finally argued me into robbing the Jew. That night I was at Louie Ray's Place when Red came in from work and asked if I was ready and I told him I guessed so.

"We walked across to the white side of the track down the sidewalk to the post office then in behind the post office and Raymond Roecker's place to the back of Paul Henig's store. Red picked up a piece of iron behind the store and we both went to the window. Red pried the wooden window open with the iron then me and Red both raised the glass window, after Red had turned the latch by sticking his hand through the broken glass. Red went in first and I second. I reached back and pulled the glass window down and pulled the wooden window to. We then went toward the front of the store on the other side of the wall that separates the store from the living quarters in the back. I stood among some dresses and Red stood among some coats. In about five or ten minutes the Jew came in the front door of the store with his flash light on. We had seen him get out of his car and start south while we were watching from the corner of the post office and we were expecting him to come in soon. Mr. Henig walked right on back to the back of the store where he has his cot. I could hear the Jew laying his clothes by and then I heard a scuffle. Red had tiptoed back to where he was

and grabbed him before I knew what was happening. I heard the Jew say: 'Whoa, who is this,' then I heard some scuffling, then I heard something hit up against the wall, and then Mr. Henig groaned. Then I came around the wall and saw Red with one hand on Henig's throat and one hand in his pocket and they were tussling in front of the cot. I ran over and grabbed Mr. Henig by the waist. Red said: 'I got it,' and I turned loose and ran to the window and Red was right behind me. When I grabbed Henig he was groaning. When Red turned loose of him he let him fall right where he was. After we went out the window Red closed the windows and we both ran. We ran down the alley toward the railroad track and stopped at the calaboose. Red said he got six dollars; he gave me three dollars and kept three and told me not to say anything about it. Red said he didn't know whether he had killed the Jew or not; that he was groaning. Then Red went over toward Henry Johnson's and I went on home.

"Where this all happened was in Glen Flora, Wharton County, Texas, and the person whom I refer to as Red is Phobie Gray and the person I refer to as the Jew was Paul Henig. The acts that I have stated above happened last Sunday, December 19, 1937.

"I remember now that I held on to Mr. Henig and helped Red stretch him out on the floor, before we ran.

"Witness my hand this the 24 day of December, A. D. 1937.
"Witnesses:                          "(Signed)   Sam Cash.
     "C. R. Siebrecht,
     "C. C. Elliott."

The county physician conducted a post-mortem examination of the deceased's body and found a bruise on his lip where the skin was knocked off, about ten or fifteen small abrasions where the skin was knocked off over his face, and his head and neck looked like they had some fingernail marks on them. There was an upper tooth knocked out. They opened his body, took out his brain and internal organs and found them all in a fairly healthy condition. However, his lungs showed a moderate amount of congestion, but no evidence of an organic disease present. The only thing about his body that showed what could have caused his death was suffocation, so the doctor said, strangulation or cutting his air off by putting something over his mouth or choking him. It could have been done by holding a blanket over his head, or by a person putting his hand over his nose or mouth. In the doctor's opinion the death of Paul Henig was caused by suffocation. The organs of his body evidenced a normal, healthy

condition, save the congested lungs and the external bruises on his face and neck.

We have gone into these facts rather thoroughly and carefully, not only on account of the gravity of the jury's verdict, but also on account of the fact that the record contains no bills of exceptions, and after such examination it seems to us that the State has met the burden placed upon it by proving beyond a reasonable doubt that the two appellants caused the death of Paul Henig by suffocating or strangling him. They were charged therewith in a properly drawn indictment, and we find no error in the proceedings at the trial. So believing, we have no alternative other than to affirm the judgment, which is accordingly done.